BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:  (858) 914-2001
Facsimile:  (858) 914-2002
Email:       fbottini@bottinilaw.com
               achang@bottinilaw.com
               ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff and
the Proposed Class and Subclass*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SETO MARSELIAN, d/b/a BISTRO PAZZO, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>   vs.<br><br>WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., and DOES 1-10, inclusive,<br><br>                 Defendants. | Case No. _____<br><br>Class Action<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Seto Marselian, d/b/a BISTRO PAZZO, on behalf of himself and all others similarly situated, alleges the following facts and claims  against Defendants WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., and DOES 1–10, inclusive (collectively, "Wells Fargo," the "Company" or "Defendants"), based upon personal knowledge as to those allegations concerning Plaintiff, and upon information and belief, as to all other matters, based on the investigation conducted by counsel, which included, among other things, a review and analysis of regulatory filings, press releases and other public statements, securities analyst and media reports, and other publicly-available information. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable discovery.

## INTRODUCTION

1.     Wells Fargo, fresh on the heels of being forced to pay $3 billion to resolve an egregious "fake account" scandal designed by the senior executives of the Company to maximize profits at the expense of innocent consumers, has engaged in yet another scam motivated by the Company's endless greed. This time the wrongful conduct is equally despicable and unlawful — manipulating the taxpayer-funded Paycheck Protection Program ("PPP") designed to help small and minority-owned businesses whose very survival is threatened by the coronavirus pandemic.

2.     Before the "fake account" scandal, Wells Fargo also engaged in fraudulent conduct with respect to its manipulation of debit charges in order to increase its overdraft fees. In a case litigated in this Court, the Honorable William H. Alsup ordered Wells Fargo to pay $203 million to California consumers and small business owners because Wells Fargo manipulated its processing of customer debit card purchases to maximize overdraft fees in violation of California state law. Instead of posting transactions chronologically, Wells Fargo deducted the largest charges

Class Action Complaint

first, drawing down available balances more rapidly and triggering a higher volume of overdraft fees. In August 2010, Judge Alsup issued a 90-page opinion ordering that Wells Fargo return to its customers approximately $203 million in restitution and enjoined the abusive accounting practices.

3.   Wells Fargo never admitted its unlawful conduct and instead filed meritless appeals. In September 2010, Wells Fargo filed an appeal with the Ninth Circuit Court of Appeals. In December 2012, the 9th Circuit Court of Appeals issued an opinion upholding and reversing portions of Judge Alsup's order, and remanded the case to the district court for further proceedings. On May 14, 2013, Judge Alsup reinstated the $203 million judgment against Wells Fargo. Wells Fargo again appealed. On October 29, 2014, the 9th Circuit affirmed Judge Alsup's $203 million judgment.

4.   At the very time it was manipulating the posting of debit card charges to increase revenue from overdraft fees, Wells Fargo was also opening fake accounts for customers who never requested them in order to increase its profits. That conduct remained concealed until approximately 2015. A few employees had tried to report the unlawful conduct to their superiors, but they were quickly fired. Reports of the misconduct were also provided to the Wells Fargo Board of Directors and the CEO at the time (John G. Stumpf), but the Board failed to stop the misconduct.

5.   On September 8, 2016, the Consumer Financial Protection Bureau fined Wells Fargo $100 million for the "widespread illegal practice of secretly opening unauthorized accounts." The order also required Wells Fargo to pay an estimated $2.5 million in refunds to customers and hire an independent consultant to review its procedures.

6.   As it had in the past, Wells Fargo denied everything and tried to blame the intentional wrongdoing on low-level employees who were just doing what they were told to do by their managers. But the truth eventually came out, and the truth was ugly. The evidence amply demonstrated that the fraud was perpetrated by those

at the very top at Wells Fargo — greedy corporate executives who put profits over the well-being of their own customers.

7.    Wells Fargo's present misconduct is eerily similar to its debit card overdraft misconduct – both involve manipulating the sequence of transactions or applications in order to maximize Wells Fargo's profits at its customers' expense. In the debit card overdraft fraud, Wells Fargo did not post its customers' transactions in the chronological order in which the purchases were made, and instead posted larger transactions first (before smaller transactions which had been made earlier in time) in order to trigger an overdraft earlier and thus result in many more overdraft charges to the customer than if the purchases had been posted in the order in which they were actually made by the customer. In the present PPP loan program context, Wells Fargo failed to process loan applications in the order in which they were submitted, and instead prioritized larger loan applications so as to maximize Wells Fargo's commissions under the PPP.

8.    Wells Fargo's fraudulent conduct of opening fake accounts was so severe — forging customers' signatures and entering fake phone numbers and emails for customers on the applications so that the customers would not be able to detect the fake accounts as quickly — that the federal government imposed restrictions on Wells Fargo's ability to engage in additional lending. Thus, when the PPP was launched, these restrictions prevented Wells Fargo from participating in the program other than on a very limited basis.

9.    However, due to overwhelming demand from small businesses for the PPP loans, the federal government agreed to lift the restrictions on Wells Fargo's ability to lend in April 2020 so that Wells Fargo could process and disburse more loans under the PPP to small businesses:

> The Federal Reserve is temporarily lifting restrictions on Wells Fargo's ability to make certain commercial loans to help alleviate a crushing

Class Action Complaint

backlog of requests for federally backed loans to small businesses decimated by the worsening coronavirus crisis.[1]

10.     The Federal Reserve only lifted the restrictions on Wells Fargo on a "narrow and temporary" basis so that Wells Fargo could issue PPP loans to businesses with fewer than 50 employees.

11.     The United States is currently in the grip of the COVID-19 pandemic, which has resulted in a massive economic recession that is threatening the very survival of America's small businesses. The outbreak in the United States is one of the worst of any country. As of April 29, 2020, the Center for Disease Control reported that there were 1,005,147 confirmed cases in the U.S. and 57,505 deaths in the United States. Those numbers continue to grow.

12.     Due to the highly contagious nature of the COVID-19 virus, and in an attempt to slow the spread of the virus, the federal and state governments began ordering non-essential businesses to close their doors in March 2020. The resulting economic hardship on U.S. businesses – most of whom are small businesses such as Plaintiff – has been devastating. The stock market immediately anticipated the substantial expected economic harm, resulting in a massive stock market sell-off in March 2020.

13.     In an attempt to provide some interim relief to small businesses, Congress passed the CARES Act on March 27, 2020. Included in the CARES Act was the PPP loan/grant program which was meant to provide immediate and urgently-needed financial help to small businesses.

14.     The stated intent of the CARES Act was prioritizing "small business concerns and entities in underserved and rural markets, including veterans and

---

[1] *See* Ledyard King, "Fed allows Wells Fargo to expand role in overwhelmed small-business loan program," USA TODAY, April 8, 2020.

members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals."

15.     Banks that elected to participate in the PPP were supposed to process applications from all businesses and also on a first-come, first-served basis, as required by the rules governing that program.

16.     Due to its past unlawful conduct in the "fake account" scandal, Wells Fargo was initially precluded from participating in the PPP program.

17.     Wells Fargo desired to participate in the PPP program because the program offered it large commissions of between 1–5% of the loan amount. This represented a very attractive opportunity for Wells Fargo because the loans were risk-free since they are guaranteed by the Small Business Administration ("SBA") and the federal government. The United States Treasury stated the following when rolling out the PPP:

> Are these loans guaranteed by the SBA? Yes, the SBA guarantees 100% of the outstanding balance, and that guarantee is backed by the full faith and credit of the United States.[2]

18.     To gain access to this honey pot, Wells Fargo represented that it would abide by the terms of the PPP and assist small businesses with fewer than 50 employees if it were allowed to participate in the program.

19.     However, after the Federal Reserve temporarily lifted the restrictions on Wells Fargo's asset cap in response to the Company's promises, thus allowing Wells Fargo to participate in the PPP program, Wells Fargo engaged in wrongful conduct designed to maximize its fees at the expense of the very small businesses who the CARES Act was designed to help. Among other things, Wells Fargo: (1) at least initially limited applications to those businesses who had a pre-existing lending

---

[2] *See* United States Treasury, "PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET for LENDERS," *available at* https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf, (last visited May 1, 2020).

relationship with the Company; and/or (2) prioritized loan applications from larger companies seeking higher loan amounts because processing those applications first generated larger loan origination fees for the banks.

20.     ***The result of Wells Fargo's conduct was that small and minority-owned businesses — those who were supposed to be helped by the PPP program — were shut out of the PPP loan program***. Instead, big businesses which in many cases did not even need the money to survive were favored:

> ***Firms owned by African-Americans were 20% less likely to obtain financing at large banks than white-owned businesses with similar profitability, credit risk and other factors***, according to researchers at the Federal Reserve Banks of Atlanta and Cleveland.[3]

21.     Lenders other than Wells Fargo concurred that Wells Fargo's approach to the PPP loan program was likely to thwart the very purpose of the program:

> "If banks only serve their customers, then the very businesses that may need access to the PPP program most will be left out in the cold, no question," said Michael Korengold, chief executive of Enhanced Capital Group LLC.[4]

22.     Wells Fargo failed to disclose that it was only favoring its existing big customers with pre-existing lending relationships with the Company, and that it was processing the PPP applications it received in such a manner as to maximize its commissions with the least amount of work in order to make the bank the most money.

23.     Had Wells Fargo complied with the law, small businesses could have (and would have) submitted their PPP applications to other financial institutions that were processing applications on a first-come, first-served basis.

---

[3] *See* Ruth Simon, "Big Banks Favor Certain Customers in $350 Billion Small-Business Loan Program," THE WALL STREET JOURNAL, April 6, 2020.

[4] *Id.*

24.     As a result of Wells Fargo's unfair business practices, however, thousands of small businesses that were entitled to loans under the PPP did not receive the critical loan proceeds they needed while most at risk.

## JURISDICTION AND VENUE

25.     This Court has original jurisdiction over this Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) at least some members of the proposed Class are citizens of different states than Defendants; (2) the proposed class consists of more than 100 persons or entities; and (3) the claims of the proposed Class Members exceed $5,000,000 in the aggregate.

26.     This Court has personal jurisdiction over Defendants because Defendants do business in this District and a substantial number of the events giving rise to the claims alleged herein took place in this District.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District. Defendants are headquartered in San Francisco and marketed, promoted, and took applications for the PPP loans in this District.

## INTRADISTRICT ASSIGNMENT

28.     In compliance with Local Rule 3-2(d), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Francisco.

## PARTIES

29.     Plaintiff Seto Marselian is an individual and small business owner residing in San Diego, California. Mr. Marselian operates a restaurant in La Jolla, California called BISTRO PAZZO.

30.     Because Plaintiff satisfied the eligibility requirements for the PPP, Plaintiff submitted a PPP loan application to Wells Fargo. However, due to Wells Fargo's wrongful conduct, as alleged herein, Plaintiff's loan application was not

timely or properly processed by the Company, and Plaintiff did not receive any PPP loan proceeds under the PPP through Wells Fargo, thus prejudicing and damaging Plaintiff.

31.    Defendant WELLS FARGO & COMPANY is a holding company headquartered in San Francisco, California at 420 Montgomery Street. The company's subsidiaries provide various banking and financial services to businesses and consumers. WELLS FARGO & COMPANY conducts substantial business in this District.

32.    Defendant WELLS FARGO BANK, N.A., is a bank and the main subsidiary of WELLS FARGO & COMPANY, and is headquartered in San Francisco at 420 Montgomery Street. Wells Fargo conducts substantial business in all Counties within the State of California.

33.    Plaintiff is unaware of the names, identities, or capacities of the defendants sued as Does 1–10, but is informed and believes and therefore alleges that each such fictitiously-named defendant is responsible in some manner for the damages and wrongdoing in this Complaint. Plaintiff will amend his Complaint to state the true names, identities or capacities of such fictitiously named defendants when ascertained.

## FACTUAL ALLEGATIONS

**A.    Wells Fargo's Participating in the PPP Was Initially Restricted Due to Its Past Fraudulent Conduct**

34.    Due to restrictions imposed by the Federal Reserve in February 2018 as part of a consent decree resulting from the Company's "fake account" scandal, Wells Fargo was burdened by an asset cap that precluded it from expanding beyond the limits of the asset cap. Those restrictions still existed in early 2020 when the PPP program was launched.

Class Action Complaint

35.     Thus, as of the first day that the PPP was open (April 3, 2020), Wells Fargo could participate in the PPP but only to the extent of issuing up to $10 billion in PPP loans.

36.     When it announced its limited participation in the PPP program on April 6, 2020, Wells Fargo represented that it would focus its efforts on "nonprofits and businesses with fewer than 50 employees." In a press release issued on April 5, 2020, Wells Fargo stated:

> SAN FRANCISCO--(BUSINESS WIRE)--Wells Fargo & Company (NYSE: WFC) announced today it is targeting to distribute a total of $10 billion to small business customers under the requirements of the PPP and ***will focus on serving two segments of its customer population: nonprofits and small businesses with fewer than 50 employees***. The company has received forms from customers expressing interest in the PPP that it expects will fill the company's capacity to lend under the program, as it continues to operate under existing asset cap limitations.
>
> *       *       *
>
> ***We are committed to helping our customers during these unprecedented and challenging times***, but are restricted in our ability to serve as many customers as we would like under the PPP. ***While all businesses have been impacted by this crisis, small businesses with fewer than 50 employees and nonprofits often have fewer resources. Therefore, we are focusing our efforts under the Paycheck Protection Program on these groups," said Wells Fargo CEO Charlie Scharf.*** [5]

**B.     Due to Overwhelming Demand by Desperate Small Businesses for PPP loans, the Federal Reserve Granted Wells Fargo a "Narrow and Temporary" Lifting of the Restrictions Previously Imposed So That Wells Fargo Could Expand Its Participation in the PPP and Help Issue PPP Loans to Small Businesses**

37.     Wells Fargo initially approached the Federal Reserve before the PPP was rolled out and asked for permission to underwrite more loans under the PPP, but the

---

[5] *Available at* https://newsroom.wf.com/press-release/community-banking-and-small-business/wells-fargo-receives-strong-interest-paycheck, (last visited May 1, 2020).

government refused to lift the restrictions since Wells Fargo had not yet sufficiently fixed its problems that resulted in the fake account scandal:

> Fed officials had earlier said they would remove the restrictions only after Wells Fargo demonstrated that it had improved itself enough that its customers would be safe from further harm — something that has not happened yet.[6]

38.    Thereafter, the PPP loan program was launched with the restrictions imposed on Wells Fargo by the Federal Reserve still intact. After initial demand overwhelmed the SBA and participating banks, Wells Fargo again petitioned the Federal Reserve to lift the restrictions burdening it so that the Company could expand its participation in the PPP.

39.    As a result of these further entreaties from Wells Fargo, the Federal Reserve temporarily lifted the restrictions, thus allowing Wells Fargo to participate in the PPP. The Federal Reserve stated at the time that it had only lifted the restrictions on Wells Fargo on a "narrow and temporary" basis so that the Company could issue PPP loans to businesses with fewer than 50 employees.

40.    Wells Fargo then immediately issued a press release on April 8, 2020 announcing that it had been freed to process PPP loan applications:

**Wells Fargo to Expand Participation in the Paycheck Protection Program (PPP)**

Community Banking and Small Business, Corporate and Financial

April 8, 2020

SAN FRANCISCO — (BUSINESS WIRE) — ***Wells Fargo & Company*** (NYSE: WFC) announced today that beginning immediately, in response to the actions by the Federal Reserve, it ***will expand its participation in the Paycheck Protection Program and offer loans to a broader set of its***

---

[6] *See* Emily Flitter, "Fed May Ease Lending Curb on Wells Fargo to Help Small Businesses," THE NEW YORK TIMES, April 6, 2020.

*small business and nonprofit customers subject to the terms of the program*.

"Wells Fargo appreciates the targeted action of the Federal Reserve to support the needs of small businesses through PPP and *looks forward to expanding relief to many more small businesses and nonprofits*. In the first two days alone, we received more than 170,000 indications of interest from our customers, and know there is much more need. While the asset cap does not specifically restrict Wells Fargo's participation in this program, *this action by the Federal Reserve will enable Wells Fargo to provide additional relief for our customers and communities*," *said Wells Fargo CEO Charlie Scharf*.

\*   \*   \*

"While *we are pleased to be able to help more small businesses through the Paycheck Protection Program*, we note that the Federal Reserve's action does not – and should not – in any way relieve us of our obligations under the consent order," said Scharf. "I have said consistently since arriving at Wells Fargo that management has the responsibility to do the work necessary under the consent order. The consent order exists because of deficiencies that have existed at Wells Fargo for years."[7]

41.    Wells Fargo's statement in its press release that it "will expand its participation in the Paycheck Protection Program and offer loans to a broader set of its small business and nonprofit customers subject to the terms of the program" was an affirmative representation that Wells Fargo would focus its attention on "its small business and nonprofit customers" and would conform its conduct to "the terms of the program" including processing applications on a first-come, first-served basis.

/ / /

/ / /

/ / /

/ / /

----

[7] *Available at* https://newsroom.wf.com/press-release/community-banking-and-small-business/wells-fargo-expand-participation-paycheck, (last visited May 1, 2020).

**C.    Wells Fargo Is Motivated to Participate in the PPP Due to the Generous Commissions on the Risk-Free Loans**

42.    Wells Fargo desired to participate in the PPP program because the program offered it large commissions of between 1-5% of the loan amount. This represented a very attractive opportunity for Wells Fargo since the loans were risk-free due to the fact that they are guaranteed by the SBA and the federal government. The United States Treasury stated the following when rolling out the PPP:

> Are these loans guaranteed by the SBA? Yes, the SBA guarantees 100% of the outstanding balance, and that guarantee is backed by the full faith and credit of the United States.[8]

43.    The commission of 1-5% of the loan amount was calculated according to the following schedule given to lenders by the United States Treasury:

> How will lenders be compensated? Processing fees will be based on the balance of the financing outstanding at the time of final disbursement. SBA will pay lenders fees for processing PPP loans in the following amounts:
>
> • Five (5) percent for loans of not more than $350,000;
>
> • Three (3) percent for loans of more than $350,000 and less than
>
>   $2,000,000; and
>
> • One (1) percent for loans of at least $2,000,000.[9]

44.    Smaller loans resulted in smaller commissions for Wells Fargo (the percentage of the commission for smaller loan amounts was nominally greater than that for higher loan amounts for the very reason that a higher absolute commission is earned on higher loan amounts). In addition to the fact that smaller loans resulted in smaller commissions, Wells Fargo knew that small loans required a lot more work.

---

[8] *See* United States Treasury, "PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET for LENDERS," *available at* https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf, (last visited May 1, 2020).

[9] *Id.*

Unsophisticated small businesses were not knowledgeable about the PPP requirements and many small businesses had a hard time putting together the necessary paperwork since they had been forced to shutter their businesses and thus were having difficulties accessing their records. Wells Fargo knew these small businesses would need a lot of hand-holding, follow up work, and corrections to applications which would have mistakes. The Treasury advised banks that the following underwriting was required by banks:

> What underwriting is required? As explained in the PPP Interim Final Rule, you will need to confirm receipt of borrower certifications; confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020; confirm the dollar amount of average monthly payroll costs; and follow applicable Bank Secrecy Act requirements.[10]

45.     Wells Fargo also knew what was widely reported on the front page of every newspaper at the time — that the PPP would quickly run out of money. Thus, Wells Fargo's ability to maximize its commissions depended on processing the largest dollar value loans from its largest customers in the quickest amount of time. Wells Fargo quickly realized the way to do that was not to focus on the small businesses with fewer than 50 employees (who needed the loans the most), but instead to process larger-dollar loans from bigger customers who were more sophisticated, needed less hand-holding, and who would be able to get the necessary paperwork together quicker and with less mistakes.

46.     Focusing on these customers, even though they needed the money less (if at all), would maximize Wells Fargo's commissions. Just as it had done with respect to its unlawful artificial sequencing of debit card transactions in the past, Wells Fargo processed PPP loan applications in a manner designed to maximize the Company's own profits.

---

[10] *Id.*

47.    Small businesses are the backbone of the American economy. Indeed, about half of the people that work in America work for a small business. These businesses and their employees have been hit hard due to the global COVID-19 pandemic.

48.    On March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization. On March 19, 2020, Governor Gavin Newsom issued an executive Stay at Home Order in the State of California in order to slow the spread of COVID-19.

49.    On March 25, 2020, in response to the economic fallout of the COVID-19 crisis, the United States Senate passed the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act. The CARES Act passed the House the next day and was signed into law by President Trump on March 27, 2020. The legislation included $377 billion in federally guaranteed loans to small businesses and established a $500 billion government lending program for distressed companies. Unprecedented in size and scope, the legislation was the largest-ever economic stimulus package in U.S. history, amounting to 10% of the total U.S. gross domestic product.

50.    As part of the CARES Act, the Federal Government created the PPP, a $349 billion loan program for small businesses with funds available for loans originated from February 15 through June 30, 2020. The PPP intended to provide American small businesses with eight weeks of cash-flow assistance through 100 percent federally guaranteed loans. The loans are backed by the SBA which is a United States government agency that provides support to entrepreneurs and small businesses. The loans were backed by the Federal Government and SBA but administered by private banks. One of the most important aspects of the PPP loans is that the terms provide criteria for loan forgiveness through a process that incentivizes companies to retain, and not lay off, employees during this crisis.

Class Action Complaint

51.     It was the express intent of the United States Senate and Congress in passing the CARES Act that the funds be used to support small businesses, particularly rural businesses, veteran owned businesses, woman owned businesses, and businesses owned by socially and economically disadvantaged persons.[11] The text of the Bill itself provides: "It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years."

52.     During the signing of the CARES Act, ranking member of the House Small Business Committee Representative Steve Chabot (R-Ohio) praised the legislation as giving small businesses a great chance to reopen.[12] Senator Marco Rubio (R-FL), Chairman of the Senate Small Business and Entrepreneurship Committee, stated that the "bipartisan small business package … will provide emergency relief so that millions of American workers can keep their jobs and millions of small businesses can stay open."[13] Senate Majority Whip, Senator John Thune (R-SD) stated that the funds provided by the CARES Act "will deliver relief to small businesses to help them and their workers weather this storm."[14]

---

[11] H.R.748(P)(iv) — CARES Act.

[12] REMARKS BY PRESIDENT TRUMP AT SIGNING OF H.R.748, THE CARES ACT, 2020 WL 1485787, at *67 (Mar. 27, 2020).

[13] (Sen. Rubio, Press Release, 3/25/2020 https://www.rubio.senate.gov/public/index.cfm/pressreleases? ContentRecord_id=D08E8A75-546A-4C56-A890-B948048E9B5C).

[14] (Sen. Thune, Press Release, 3/25/2020 https://www.thune.senate.gov/public/index.cfm/pressreleases?ID=CA914CF0-5C3D-4A02-B6F2-84925B5467BD).

53.     After the Federal Reserve lifted the restrictions on Wells Fargo's capital base so that it could expand its participation in the PPP, Wells Fargo's CEO Charlie Scharf stated that the Company intended to follow the law and direct the PPP funds to the small businesses that Congress and the Senate intended to help. Wells Fargo CEO Charlie Scharf said in an interview "We are committed to helping our customers during these unprecedented and challenging times, but are restricted in our ability to serve as many customers as we would like under the PPP. While all businesses have been impacted by this crisis, *small businesses with fewer than 50 employees and nonprofits often have fewer resources. Therefore, we are focusing our efforts under the Paycheck Protection Program on these groups*."[15]

54.     On April 3, 2020, the federal government announced that small businesses could begin applying for PPP loans. Starting April 10, 2020, independent contractors and self-employed individuals could apply.[16]

55.     After it convinced the Federal Reserve to "narrowly and temporarily" lift the restrictions imposed upon it by the consent decree from the fake account scandal, Wells Fargo solicited business under the PPP from individuals and small businesses. Wells Fargo told potential applicants "[w]e encourage you to apply as soon as possible."

56.     It was widely reported at the time that demand for the PPP loans was overwhelming. It was subsequently reported that demand was so strong that the available funds under the PPP might be quickly exhausted. Thus, small businesses were told to act fast, and were also told that applications would be processed in the order they were received.

---

[15] https://www.businesswire.com/news/home/20200405005041/en/Wells-Fargo-Receives-Strong-Interest-Paycheck-Protection.

[16] *Id.*

57.    In fact, the Federal Regulations that govern the PPP funds mandate that the funds be distributed "first come, first served."[17] The rules also require that "Lenders must comply with the applicable lender obligations set forth in this interim final rule." The federal regulations state as follows:

> Is the PPP ''first-come, first-served?''
>
> Yes.[18]

58.    Thus, according to the federal regulations published in the Federal Register, which lenders were required to comply with, lenders were required to process PPP applications on a "first-come, first-served" basis.

59.    However, Wells Fargo failed to comply with the federal regulations governing the PPP program.

60.    The terms of the PPP loans only allow for each small-business borrower to obtain a single SBA backed loan through the PPP. The Federal Regulations provide: "The Administrator, in consultation with the Secretary, determined that no eligible borrower may receive more than one PPP loan. This means that if you apply for a PPP loan you should consider applying for the maximum amount."[19]

61.    Upon information and belief, Wells Fargo received thousands of applications and chose to prioritize higher loans for bigger companies, despite the fact that the Federal Regulations required Wells Fargo to process the applications on a first-come, first-serve basis.

62.    As a result of its unlawful conduct, pursuant to which Wells Fargo prioritized the processing of larger loans and/or loans from its favored customers,

---

[17] *See* 85 Fed. Reg. No. 73, 13 CFR Part 120, April 15, 2020, "Business Loan Program Temporary Changes; Paycheck Protection Program."

[18] *Id.*

[19] *Id.* at § k.

Wells Fargo — along with other banks — received nearly $6 billion in fees while hundreds of thousands of loan applicants got nothing.

63.     Data provided by the SBA reveals that, rather than processing PPP loan applications on a "first come, first served" basis as required, Wells Fargo prioritized and front-loaded applications with higher loan amounts. This is shown by comparing data from loans processed between April 3, 2020 (when the PPP started) and April 13th versus data between April 13th and April 16th (when the program ran out of money).

64.     Here is a breakdown of the loans processed through April 13, 2020:[20]

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 725,058 | $37,178,984,187 | 70.05% | 15.02% |
| >$150K - $350K | 156,590 | $35,735,615,983 | 15.13% | 14.44% |
| >$350K - $1M | 102,473 | $59,291,602,643 | 9.90% | 23.95% |
| >$1M - $2M | 31,176 | $43,278,883,532 | 3.01% | 17.48% |
| >$2M - $5M | 16,516 | $49,288,997,593 | 1.60% | 19.91% |
| >$5M | 3,273 | $22,769,309,582 | 0.32% | 9.20% |

65.     Here is the same information, updated through April 16, 2020[21]:

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 1,229,893 | $58,321,791,761 | 74.03% | 17.04% |
| >$150K - $350K | 224,061 | $50,926,354,675 | 13.49% | 14.88% |
| >$350K - $1M | 140,197 | $80,628,410,796 | 8.44% | 23.56% |
| >$1M - $2M | 41,238 | $57,187,983,464 | 2.48% | 16.71% |
| >$2M - $5M | 21,566 | $64,315,474,825 | 1.30% | 18.79% |
| >$5M | 4,412 | $30,897,983,582 | 0.27% | 9.03% |

---

[20] https://www.sba.gov/sites/default/files/2020-04/PPP%20Report%20SBA%204.14.20%20%20-%20%20Read-Only.pdf.

[21] https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.

1
2
3

66.     Comparing the April 13 data to the April 16 data shows that in the last three days of the PPP, the banks processed loan applications for $150,000 and under at twice the rate of larger loans:

4
5
6
7
8
9
10
11

| | 4/13/2020 | 4/16/2020 | % Change |
|---|---|---|---|
| Loan Size | Approved Loans | Approved Loans | |
| $150K and Under | 725,058 | 1,229,893 | 70% |
| >$150K - $350K | 156,590 | 224,061 | 43% |
| >$350K - $1M | 102,473 | 140,197 | 37% |
| >$1M - $2M | 31,176 | 41,238 | 32% |
| >$2M - $5M | 16,516 | 21,566 | 31% |
| >$5M | 3,273 | 4,412 | 35% |

12
13
14
15

67.     This data demonstrates that banks front-loaded applications for the largest loans because, if applications were being processed on a first-come, first-served basis as required, the percentage change of applications submitted in the last three days of the program would be consistent among all application types.

16
17
18
19
20

68.     Wells Fargo chose to prioritize the applications with higher loan amounts because processing those applications first resulted in larger commissions for the Company. Just as it had done with respect to overdraft fees in the past, Wells Fargo artificially processed applications in order to maximize its own fees, despite the fact that doing so was detrimental to its customers.

21
22
23
24

69.     Specifically, Wells Fargo was entitled under the PPP to receive origination fees of 5% on loans up to $350,000; 3% on loans between $350,000 and $2 million; and 1% on loans between $2 million and $10 million.[22] Thus, Wells Fargo could make up to $17,500 for processing loans up to $350,000; up to $60,000 for

25
26
27
28

---

[22]https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact %20Sheet.pdf.

processing loans between $350,000 and $2 million; and up to $100,000 for processing loans between $2 million and $10 million.

70.     Upon information and belief, Wells Fargo prioritized those PPP loans that earned them the highest commissions rather than processing PPP loan applications on a "first come, first served" basis as required. In doing so, Wells Fargo enriched itself at the expense of Plaintiff and the Class who needed the temporary funding of the PPP loans to make payroll, retain their employees, and stay afloat.

71.     Wells Fargo knew that it received more PPP applications than it would be able to process, but concealed from Plaintiff and the Class that it was prioritizing larger loans in order to maximize its commissions.

72.     Had Wells Fargo informed Plaintiff and the Class of these facts, then Plaintiff and the Class would have submitted their PPP applications to other lending institutions that were processing applications on a first come, first served basis.

## FACTUAL ALLEGATIONS REGARDING PLAINTIFF

73.     Plaintiff Bistro Pazzo is a small business operating a restaurant in La Jolla, California.

74.     In or around March of 2020, Plaintiff became aware that the CARES Act had been signed into law.

75.     Subsequently, the State of California issued an order requiring Plaintiff to close its business since Plaintiff's business of operating a restaurant is considered a "non-essential" business in the State of California.

76.     Since it operates a restaurant, there is no way for Plaintiff to operate the business remotely. Therefore, since being forced to close the business by the State of California, Plaintiff's business has been severely and adversely affected.

77.     Due to the severe economic impact on its business, Plaintiff submitted an application for a PPP loan through Wells Fargo in April 2020. Plaintiff's application to Wells Fargo was thorough and complete, and contained all the necessary information.

78.     In doing so, Plaintiff relied on the representations of the CEO of Wells Fargo, who said "While all businesses have been impacted by this crisis, small businesses with fewer than 50 employees and nonprofits often have fewer resources. Therefore, we are focusing our efforts under the Paycheck Protection Program on these groups." Knowing he could only receive one PPP loan, Plaintiff believed that Wells Fargo — a large, national bank — would be his best choice for obtaining funding under the PPP.

79.     After submitting the PPP loan application, Plaintiff waited to receive the PPP funds. While Plaintiff waited to receive funding, Plaintiff made strategic business decisions, made personnel decisions, and took other steps in reliance on Wells Fargo's representations that their lending would be "focused" on businesses with under 50 employees and would be "first-come, first served."

80.     Indeed, even after Plaintiff submitted his paperwork to Defendants, Wells Fargo continued to represent that applications would be processed on a first-come, first-served basis. In April 2020, Plaintiff received an email from Wells Fargo entitled "We have received your application for Paycheck Protection Program Loan," which represented that:

> We know how important this program is for you, and we're working as quickly as possible to prepare your application submission to the U.S. Small Business Administration (SBA).

81.     Following this initial email, Plaintiff received an email from Wells Fargo in April entitled "Update on the Paycheck Protection Program," which represented that:

> We are doing everything we can to help our small business customers navigate this difficult and uncertain time. In that spirit, we want to keep you updated about your application for funding through the Paycheck Protection Program (PPP).

82.     Then, Plaintiff received another email from Wells Fargo stating that funding for the PPP had been exhausted and that Plaintiff's application was still in the proverbial queue but had not been processed or funded:

> You may have heard that **the U.S. Small Business Administration (SBA) has run out of money to fund PPP loans, and we realize this may be causing you frustration and concern.** Given the magnitude of the crisis the country is facing, we are hopeful that Congress will approve additional funds for the PPP. In anticipation of additional approved funds, Wells Fargo continues to prepare customers' PPP loan applications to be ready for submission to the SBA if and when this occurs.

83.     On information and belief, Wells Fargo did not "focus" its lending efforts on businesses with under 50 employees and did not process the applications in a "first-come, first-served" manner. Wells Fargo did not follow the Federal Regulations or the intent of the United States Senate and Congress in distributing the PPP funds. Instead, Wells Fargo moved high dollar applications from large and mid-sized companies to the "front of the line" in order to maximize its commissions on these no-risk, federally-insured loans.

84.     Despite the fact that Wells Fargo did not "focus" its lending efforts on businesses with under 50 employees and did not process the applications on a "first-come, first-served" manner, Wells Fargo made numerous affirmative representations to its customers, potential applicants, and the public that they were in fact prioritizing loans to small businesses and processing applications on a first-come, first-served basis. Wells Fargo made these affirmative representations to advance its own financial benefit to the detriment of their applicants and consumers such as Plaintiff.

85.     By misrepresenting the manner in which the Company would process PPP loans for consumers and small businesses, Wells Fargo engaged in wrongful conduct designed to maximize its own commissions and profits.

86.     Plaintiff and the Class reasonably relied on Wells Fargo's affirmative representations, communications, and advertising in making the choice to apply for

their one PPP loan through Wells Fargo, not knowing that, contrary to those representations, Wells Fargo would prioritize large or "more important" borrowers, making it less likely that Plaintiff and the Class would be able to obtain a loan through the PPP. As a result of their reliance on Wells Fargo's representations, Plaintiff and the Class suffered economic harm. Had Plaintiff and the Class known that Wells Fargo was prioritizing large loans, Plaintiff could have avoided the harm by applying for a loan at a different bank, such as a local community bank.

87.     As a result of the conduct of Wells Fargo, Plaintiff's business suffered financial harm and lost the opportunity to obtain funding that was likely to be forgiven by the federal government, lost the value of the available PPP funds, lost access to critically-needed capital during the worst recession in decades, could not make payroll, and was forced to lay off talented and hardworking employees that Plaintiff had invested valuable resources in, and generally lost economic opportunities to conduct business due to lack of operating capital.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action on behalf of himself and a class defined as follows:  All individuals and small businesses in the United States that met the criteria for receiving a loan under the PPP and who timely applied for a PPP loan through Wells Fargo, but whose applications were not processed and/or who were not issued loans by Wells Fargo. Plaintiff also brings this action on behalf of a Subclass defined as all individuals and small businesses in the State of California who are class members.

89.     Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

90.     The members of the Class and Subclass are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown

to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Members of the Class and Subclass may be identified from records maintained by Wells Fargo since the Company received written applications for PPP loans from all Class and Subclass members.

91.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of state law that is complained of herein.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass and has retained counsel competent and experienced in class action litigation.

93.     Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class and Subclass are:

(a)     whether defendants agreed to comply with the terms of the PPP loan program and regulations governing the program;

(b)     whether defendants agreed to process PPP loan applications on a first-come, first-served basis;

(c)     whether defendants failed to disclose to Plaintiff and Class members the fact that Wells Fargo was prioritizing certain loan applications and not processing all applications based on the time received; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

94.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### First Cause of Action

**On Behalf of Plaintiff and the Class for Violation of California Civil Code § 1710**

95.     Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

96.     Defendants were obligated to tell Plaintiff and the other Class members of all information Defendants possessed that was material to Plaintiff's and the other Class members' interests.

97.     In addition, once Defendants communicated certain facts to Plaintiff and the Class, they were required to disclose additional facts necessary to avoid misleading Plaintiff and the Class. As alleged herein, Defendants issued press releases and statements to the public at the time that the Federal Reserve restrictions were lifted so that Wells Fargo could participate in the PPP loan program to the effect that Wells Fargo intended to prioritize small businesses with fewer than 50 employees, that Wells Fargo would comply with the terms of the PPP loan program, and that Wells Fargo would process PPP loans on a first-come, first-served basis.

98.     At the same time, Defendants failed to disclose to Plaintiff and the Class that Wells Fargo did not intend to fulfill its promises, did not intend to adhere to the PPP regulations, did not intend to process PPP loans on a first-come, first-served basis, and intended to prioritize higher value loans and/or "more important" customers.

99.     During the Class Period, Defendants intentionally concealed such material facts from Plaintiff and the Class with the intent to defraud Plaintiff and the Class. Defendants knew that Plaintiff and the Class would not have submitted their PPP loan applications to Wells Fargo if the true facts were disclosed, and instead that Plaintiff and the Class would have selected a different bank. Defendants thus

concealed the facts in order to wrongfully induce Plaintiff and the Class to enter into such transactions.

100.   Plaintiff and other members of the Class were unaware of these concealed facts, and had no means of ascertaining such concealed facts. Moreover, these concealed facts were highly material to Plaintiff and other members of the Class, and Plaintiff and other members of the Class would not have retained Defendants to act as their bank to process their PPP loan application had Defendants disclosed the true facts.

101.   Defendants benefitted from their wrongdoing because they obtained higher commissions and profits from the PPP loan program than they would have had they complied with the law.

102.   As a result of Defendants' concealment of these material facts, Plaintiff and other members of the Class have been injured.

### Second Cause of Action
### On Behalf of Plaintiff and the Class for Unjust Enrichment

103.   Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

104.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

105.   During the relevant period, Defendants received unlawful commissions or profits relating to the PPP loan program as a result of prioritizing higher dollar loan applications and by failing to adhere to their own representations and the regulations governing the PPP loan program.

106.   Plaintiff and the Class were harmed because their applications were not processed in the order they were received and they did not receive PPP loan proceeds.

107.   Plaintiff and the Class seek an order from this Court mandating disgorgement of the unjust enrichment received by each defendant.

**Third Cause of Action**
**On Behalf of Plaintiff and the Class for an Accounting**

108.   Plaintiff incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

109.   At all relevant times Defendants solicited PPP loan applications from Plaintiff and the Class.

110.   During the Class Period, Defendants obtained more commissions and profits while acting as a banker and banking agent for Plaintiff and the Class with respect to the PPP loan application process.

111.   Plaintiff and the Class seek an accounting from Defendants to identify all profits, commissions, and compensation received from third parties during the Class Period related to the PPP loan program.

112.   Plaintiff and the Class seek a constructive trust over all the profits, commissions, and compensation received by Defendants during the Class Period related to the PPP loan program.

**Fourth Cause of Action**
**On Behalf of Plaintiff and the Subclass for Violation of the "Unfair"**
**Prong of the UCL, California Business & Professions Code §§ 17200,** *et seq.*

113.   Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

114.   Plaintiff asserts this cause of action on behalf of himself and members of the Subclass.

115.   The California Unfair Competition Law (hereinafter "UCL") defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. CAL. BUS. & PROF. CODE § 17200.

116.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

117.   Defendants violated the "unfair" prong of the UCL by subverting both the process and the intent of PPP loans by prioritizing large borrowers to the detriment of the "small business" applicants the funds were intended to support. Further, they made misrepresentations to their PPP applicants and the public about the process which unfairly induced applicants to apply with Defendants, thereby resulting in an unjust financial benefit to Defendants at the expense of Plaintiff and the Class.

118.   Defendants' acts and practices were unfair because they misled Plaintiff and the other members of the Class to falsely believe that Defendants were focused on serving small businesses when they were not, and that the PPP loan applications were processed fairly and "first-come, first-served" based on the program criteria when they were not.

119.   The gravity of the harm to members of the Class resulting from these unfair acts and practices outweighed any conceivable reasons, justifications, and/or motives the Defendants had to profit from PPP loans. By committing the acts and practices alleged above, Defendants engaged in unfair business practices within the meaning of California Business & Professions Code § 17200, *et seq.*

120.   Through its unfair acts and practices, Defendants have improperly obtained money and property directly or indirectly from Plaintiff and the Class. As such, Plaintiff requests that this Court cause Defendants to disgorge their profits and money to Plaintiff and all Class Members, and to enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future, most notably if this program is funded again.

**Fifth Cause of Action**
**On Behalf of Plaintiff and the Subclass for Violation of the "Fraudulent" Prong of the UCL, California Business & Professions Code §§ 17200, *et seq*.**

121.   Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

122.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. CAL. BUS. & PROF. CODE § 17200.

123.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

124.   As set forth above, the Defendants' conduct included affirmative representations about the loan approval process and the "focus" and "priorities" of the bank in processing and funding PPP loans which were not true. Those representations were made with the intent to generate business from Plaintiff and the Class and to induce consumers to reasonably rely on those representations and choose Defendants when making their decision about who to seek a PPP loan from.

125.   Defendants deceived Plaintiff and the Class by failing to disclose that Defendants did not intend to process PPP applications on a first-come, first-served basis and that Defendants intended to prioritize existing clients of the bank and those clients with bigger accounts and/or higher loan value applications.

126.   Defendants' acts and practices as described herein have deceived Plaintiff and the Class and were highly likely to deceive members of the public. Specifically, in deciding with which bank should he apply for a PPP loan, Plaintiff relied upon Defendants' misleading and deceptive representations regarding the bank's loan application and approval process. Each of these factors played a substantial role in Plaintiff's decision to apply with Defendants, and Plaintiff would not have applied for a PPP loan with Defendants in the absence of Defendants' misrepresentations, and instead would have applied at a different bank. Plaintiff has suffered monetary and economic loss as a direct result of Defendants' practices described above.

127.   As a result of the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class. Specifically, Defendants have been unjustly enriched by obtaining more revenues and profits than

they would not otherwise have obtained absent their false, misleading and deceptive conduct. Had Defendants processed the PPP loan applications in accordance with the SBA and Treasury regulations and guidance, Defendants would have earned lower commissions and profits. Taxpayers such as Plaintiff fund the federal government and thus Defendants obtained money or property from Plaintiff. In addition, Defendants wrongfully deprived Plaintiff of PPP loan proceeds Plaintiff was entitled to by their wrongful conduct, and thus engaged in an illicit trade, pursuant to which they deprived Plaintiff of the loan proceeds to which Plaintiff was entitled (which would be a grant, not a loan, so long as Plaintiff used at least 75% of the money to continue making payroll during the eight-week period following receipt of the loan proceeds) in exchange for higher commissions for themselves.

128.   Through their unfair acts and practices, Defendants have improperly obtained money and commissions directly or indirectly from Plaintiff and at the expense of Plaintiff and the Class. As such, Plaintiff requests that this Court cause Defendants to disgorge the unfair commissions and money to Plaintiff and all Class Members, and to enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future.

**Sixth Cause of Action**
**On Behalf of Plaintiff and the Subclass for Violation of the "Unlawful" Prong of the UCL, California Business & Professions Code §§ 17200, *et seq*.**

129.   Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

130.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. CAL. BUS. & PROF. CODE § 17200.

131.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

Class Action Complaint

132.   The Small Business Administration Regulations that govern the PPP funds, specifically SBA Interim Final Rule § *m*. [Docket No. SBA-2020-0015] 13 CFR Part 120, Business Loan Program Temporary Changes; Paycheck Protection Program, RIN 3245-AH34, mandated that the funds be distributed "first come, first served."

133.   Defendants have engaged in "unfair" and "deceptive" representations to the public and their loan applicants as set forth above, including by making false statements of material fact with respect to the PPP application process.

134.   Defendants have further intentionally disregarded their legal requirement to process PPP loan applications and distribute PPP funds on a "first-come, first-served" basis and in fact prioritized large businesses and allowed them to "cut the line" to the detriment of small business applicants and the members of the Class.

135.   Through its unfair acts and practices, Defendants have improperly obtained money directly or indirectly from Plaintiff and the Class at the expense of Plaintiff and the Class. As such, Plaintiff requests that this Court cause Defendants to disgorge their unfair commissions and profits to Plaintiff and all Class Members, and to enjoin Defendants from continuing to violate the UCL, and/or from violating the UCL in the future.

**Seventh Cause of Action**
**On Behalf of Plaintiff and the Subclass for**
**Violation of the California False Advertising Law,**
**California Business & Professions Code Sections §§ 17500, *et seq*.**

136.   Plaintiff hereby incorporates by reference the foregoing allegations as if fully set forth herein.

137.   The California False Advertising Law prohibits unfair, deceptive, untrue, or misleading communications and statements, including, but not limited to, false statements as to the nature of services to be provided.

138.   Defendants made or caused one another to make false and misleading representations to Plaintiff and Class Members concerning the nature of the services they would be providing as PPP loan administrators. Defendants knew, or should have known, that the PPP applications would not be processed on a "first-come, first-served basis" and yet they represented to the contrary to their customers and to the public. Further, Defendants knew or should have known that the "focus" of the bank was not on facilitating loans to small businesses with, for example, less than 50 employees, yet they represented the contrary to the public and their customers.

139.   Among other things, in advertising their services to Plaintiff, Defendants directly represented, even after Plaintiff submitted the PPP application, that "We are working through the queue in the order in which customers submitted their initial interest."

140.   Through its false representations and unfair acts and practices, Defendants have improperly obtained money and property directly or indirectly from Plaintiff and the Class and at the expense of Plaintiff and the Class. As such, Plaintiff requests that this Court cause Defendants to disgorge their commissions and profits from the PPP program to Plaintiff and all Class Members, and to enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and Subclass, prays for the following relief:

A.   For an order certifying the Class and Subclass as defined above, appointing Plaintiff as representative for the Class and Subclass, and appointing Plaintiff's counsel as counsel for the Class and Subclass;

B.   For an order declaring Defendants' actions to be unlawful;

C.   For declaratory and equitable relief to Plaintiff and other members of the Class and Subclass;

D.     For injunctive relief prohibiting Defendants from engaging in the misconduct described herein;

E.     For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the members of the Class and Subclass, including disgorgement, unjust enrichment, and all other available relief under applicable law;

F.     For an award of treble damages pursuant to any other applicable law;

G.     For an award of punitive damages pursuant to applicable law;

H.     For reasonable attorneys' fees and expenses as permitted by applicable statutes and law, including, but not limited to, Code of Civil Procedure § 1021.5;

I.     For taxable costs;

J.     For pre and post-judgment interest as allowed by law; and

K.     For any other relief the Court deems just.

## JURY TRIAL DEMANDED

Plaintiff requests a trial by jury of all claims that are so triable.

DATED:  May 8, 2020                    Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov

        s/ Francis A. Bottini, Jr.
        Francis A. Bottini, Jr.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002
Email:       fbottini@bottinilaw.com
             achang@bottinilaw.com
             ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff and
the Proposed Class and Subclass*