1
2
3
4                           UNITED STATES DISTRICT COURT
5                          NORTHERN DISTRICT OF CALIFORNIA
6
7    SETO MARSELIAN, et al.,                    Case No. 20-cv-03166-HSG
8                      Plaintiffs,              **ORDER GRANTING MOTION TO
                                                COMPEL ARBITRATION**
9            v.
                                                Re: Dkt. No. 24
10   WELLS FARGO AND COMPANY, et al.,
11                     Defendants.
12
13           Pending before the Court is the motion to compel arbitration filed by Defendants Wells

14   Fargo & Company and Wells Fargo Bank, N.A.  Dkt. No. 24.  The Court held a hearing on

15   December 10, 2020.  For the reasons detailed below, the Court **GRANTS** the motion to compel.

16   **I.    BACKGROUND**

17           In response to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief,

18   and Economic Security Act, Pub. L. No. 116-136, 134  Stat. 281 (Mar. 27, 2020) ("CARES Act").

19   As relevant to these two cases, the CARES Act amended the Small Business Act ("SBA"), 15

20   U.S.C. § 636, and established the Paycheck Protection Program ("PPP") to help small businesses

21   meet payroll and cover expenses.  *See* CARES Act, § 1102.  Under the PPP, participating lenders

22   were authorized to make loans to eligible small businesses, and the loans, in turn, were guaranteed

23   by the SBA.  *See id.*

24           Plaintiff Seto Marselian filed the above-captioned putative class action against Defendants.

25   Plaintiff alleges that (1) he submitted a PPP loan application to Defendants; and (2) at least at the

26   time he filed the complaint, he had not received PPP loan proceeds from Defendants.  *See* Dkt.

27   No. 1 ("Compl.") at ¶¶ 77–82, 87.  Plaintiff alleges that this delay was due to Defendants' decision

28   to "prioritize[] loan applications from larger companies seeking higher loan amounts," rather than

United States District Court
Northern District of California

processing them "on a first-come, first-served basis." *See* Compl. at ¶¶ 15, 19.  Doing so, Plaintiff alleges, benefited Defendants who could "maximize" their commissions if they "process[ed] the largest dollar value loans" first. *See id.* at ¶¶ 15, 17, 19, 22, 42–46, 68, 70.  But when Defendants announced their participation in the PPP, they allegedly "represented that [they] would focus [their] efforts on 'nonprofits and businesses with fewer than 50 employees.'" *See id.* at ¶ 36; *see also id.* at ¶¶ 40–41.  Plaintiff explains that had Defendants disclosed how they were actually processing the PPP loans, Plaintiff would have submitted PPP applications to other financial institutions. *See id.* at ¶¶ 22–23.  He further alleges that "[a]s a result of Wells Fargo's unfair business practices . . . thousands of small businesses that were entitled to loans under the PPP did not receive the critical loan proceeds they needed while most at risk." *Id.* at ¶ 24.

Based on these facts, Plaintiff asserts causes of action for violation of California Civil Code § 1710; violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; unjust enrichment; and accounting. *See id.* at ¶¶ 95–140.  Plaintiff also seeks to represent a class defined as "[a]ll individuals and small businesses in the United States that met the criteria for receiving a loan under the PPP and who timely applied for a PPP loan through Wells Fargo, but whose applications were not processed and/or who were not issued loans by Wells Fargo." *See* Compl. at ¶ 88.

Defendants now move to compel arbitration, or in the alternative to dismiss the claims under Rule 12(b)(6).

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable."  9 U.S.C. § 2; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting federal policy favoring arbitration); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (same).  The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided

for in such agreement."  9 U.S.C. § 4.  This federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."  *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989).  Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration."  *Id.*

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue."  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.  *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2).

## III.   DISCUSSION

Defendants first move to compel Plaintiff's claims to arbitration.  *See* Dkt. No. 24 at 4–7. In support of the motion to compel arbitration, Defendants contend that Plaintiff signed a Wells Fargo Business Account Application, and in doing so, "agree[d] to be bound by" the Wells Fargo "account agreement that includes the Arbitration Agreement."  *See* Dkt. No. 24-1, Ex. 1 at 5.  On page five of the Business Account Application, it states in **bold**:

> **The Customer's use of any Wells Fargo Bank, N.A. ("Bank") deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable . . . account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

*Id.*  The arbitration agreement within the Wells Fargo account agreement further explains that Plaintiff agrees:

//

1

2      to submit to binding arbitration all claims, disputes, and controversies
       between or among Wells Fargo and [Plaintiff] . . . whether in tort,
3      contract or otherwise arising out of or relating in any way to
       [Plaintiff's] account(s) and/or service(s), and their negotiation,
4      execution, administration, modification, substitution, formation,
       inducement, enforcement, default, or termination.

5

6    *Id.*, Ex. 8 at 6.  Defendants also proffer a declaration from a Wells Fargo Operational Risk

7    Consultant, who explains that at the time Plaintiff submitted his Business Account Application,

8    Defendants provided him with a "New Account Kit."  *See id.*, Dkt. No. 30-1 at ¶ 4.  And included

9    in this New Account Kit were the account agreement and arbitration agreement.  *Id.*  Defendants

10   also note that the account agreement is available on the Wells Fargo website.  *See* Dkt. No. 30 at

11   9; *see also* Dkt. No. 30-1 at ¶ 5.

12         Plaintiff's response is twofold.  *First*, Plaintiff challenges that he entered into an arbitration

13   agreement at all.  Plaintiff contends that Defendant Wells Fargo & Company, a holding company,

14   is not a signatory to the arbitration agreement, and as a separate entity cannot compel arbitration.

15   *See* Dkt. No. 29 at 4–5.  And Plaintiff urges that in any event, Defendants have not established that

16   Plaintiff had notice of the arbitration agreement.  *Second*, Plaintiff contends that the arbitration

17   agreement is not otherwise enforceable.  *See id.* at 6–11.

18         **A.    Existence of Agreement to Arbitrate**

19         As an initial matter, Defendants do not appear to dispute that only Defendant Wells Fargo

20   Bank, N.A., and not the holding company, is a signatory to the arbitration agreement.  *See* Dkt.

21   No. 30 at 2–3.  However, even as Plaintiff has alleged, the holding company is not a lender for

22   purposes of the PPP.  Plaintiff acknowledges in the complaint that "[t]he [holding] company's

23   *subsidiaries* provide various banking and financial services to businesses and consumers."

24   Compl. at ¶ 31 (emphasis added).  Throughout the complaint, Plaintiff refers collectively to

25   Defendants as "Wells Fargo," and does not attempt to distinguish the holding company's conduct

26   versus the bank's conduct.  *See generally* Compl.

27   //

28   //

United States District Court
Northern District of California

4

Courts applying California law[1] have routinely found that "[w]hen charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer those claims against the parent to arbitration . . . even if the parent is not formally a party to the arbitration agreement." *See Naria v. Trover Sols., Inc.*, 967 F. Supp. 2d 1332, 1339 (N.D. Cal. 2013); *see also Wilmot v. McNabb*, 269 F. Supp. 2d 1203, 1208 (N.D. Cal. 2003) (same).  Under similar circumstances, the California Court of Appeal ruled that a signatory to an arbitration agreement could not "avoid the arbitration obligation imposed by its underlying agreement with [a subsidiary]" by suing the parent company, reasoning that "[h]e who takes the benefit must bear the burden."  *See Metalclad Corp. v. Ventana Envtl. Organizational P'ship*, 109 Cal. App. 4th 1705, 1718–19 (Cal. Ct. App. 2003) (citing Cal. Civ. Code § 3521); *see also NORCAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 76 (Cal. 2000) ("The common thread [in holding nonsignatories bound by arbitration contracts] is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement.").  As the Fifth Circuit aptly explained, "[i]f the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."  *Sam Reisfeld & Son Import Company v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976); *accord J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988).

Plaintiff next suggests that he did not receive adequate notice of the arbitration agreement, and therefore cannot be bound by it.  *See* Dkt. No. 29 at 6–8.  Plaintiff points to his own declaration in which he states that when he met with Defendants to open his business account "[a]t no time during the meeting did anyone tell [him] about any arbitration agreement" and that he "do[es] not recall reading anything regarding arbitration in the application."  *See* Dkt. No. 29-1 at ¶¶ 2–3.  In addition, he stated that he "ha[s] never read any Deposit Account Agreements or any arbitration clauses in such agreements."  *Id.* at ¶ 4; *see also* Dkt. No. 34, Exs. 1–3.  Plaintiff further notes that he only signed the Business Account Application, and not the separate arbitration agreement, and says there is no evidence that he received the arbitration agreement.

---

[1] The parties appear to agree that California law governs the interpretation of the arbitration agreement.  *See* Dkt. No. 29 at 6, n.3; Dkt. No. 30 at 2–7 (citing California law).

United States District Court
Northern District of California

1  *See* Dkt. No. 29 at 6.

2      "In determining the validity of an agreement to arbitrate, federal courts 'should apply

3  ordinary state-law principles that govern the formation of contracts.'"  *See Ferguson v.*

4  *Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (quoting *First Options of*

5  *Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  "An essential element of any contract is the

6  consent of the parties or mutual assent."  *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270 (Cal.

7  2001); *see also* Civ. Code §§ 1550, 1565.  Mutual assent "is determined under an objective

8  standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable

9  meaning of their words and acts, and not their unexpressed intentions or understandings."  *Deleon*

10  *v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (Cal. Ct. App. 2012) (quotation omitted);

11  *see also* Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to

12  be ascertained from the writing alone, if possible . . . .").  "[A] party's subjective intent, or

13  subjective consent, therefore is irrelevant" to the question of mutual consent.  *See Stewart v.*

14  *Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1587 (Cal. Ct. App. 2005) (quotation omitted).

15  "[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all

16  its terms" and "cannot avoid the terms of a contract on the ground that he or she failed to read it

17  before signing."  *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal.

18  App. 4th 1042, 1049 (Cal. Ct. App. 2001), *as modified* (June 8, 2001).

19      By signing the Business Account Application, Plaintiff manifested his assent to the terms

20  in that document.  *See Marin Storage*, 89 Cal. App. 4th at 1049.  And his apparent failure to read

21  the six-page document does not undermine his assent.  *Id.*  "If a party could get out of a contract

22  by arguing that he did not recall making it, contracts would be meaningless."  *See Blau v. AT & T*

23  *Mobility*, No. C 11-00541 CRB, 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012).  Accordingly, in

24  the absence of any alleged fraud, overreaching, or excusable neglect, Plaintiff is deemed to have

25  assented to all of the agreement's terms, whether or not he actually understood or even read them.

26  These terms included the arbitration agreement.

27      Under California law, "parties may incorporate by reference into their contract the terms of

28  some other document."  *See Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44, 54 (Cal.

Ct. App. 1997).  "For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Id.*  This is readily satisfied here where the Business Account Application itself states that Plaintiff "confirm[s] [his] *receipt of*, *and agreement to be bound by*, the Bank's applicable . . . account agreement that includes *the Arbitration Agreement . . . .*" *See* Dkt. No. 24-1, Ex. 1 at 5 (emphasis added).  Moreover, the Business Account Application explains the key provisions of the arbitration agreement:  Plaintiff agrees that "any dispute between [Plaintiff] and the Bank relating to [Plaintiff's] use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator" and "not by a jury or court trial." *Id.*  Defendants further proffer evidence that they provided Plaintiff with the arbitration agreement, *see id.*, Dkt. No. 30-1 at ¶ 4, and that it is also available on the Wells Fargo website.  *See* Dkt. No. 30 at 9; *see also* Dkt. No. 30-1 at ¶ 5.  "If Plaintiff had not received the [arbitration] agreement and was concerned about being bound to terms []he had not read, []he could have asked to see it before signing it*." Al-Thani v. Wells Fargo & Co.*, No. C 08-1745 CW, 2009 WL 55442, at *6 (N.D. Cal. Jan. 7, 2009).

Plaintiff's cases are inapposite.  *See* Dkt. No. 29 at 7–8.  None involves circumstances where the plaintiff physically signed an agreement, as Plaintiff did here.  In *Lee v. Intelius*, 737 F.3d 1254 (9th Cir. 2013), and *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014), for example, the Ninth Circuit considered whether a binding agreement could be formed through websites where (1) a user is presented with the terms and conditions and must click on a button or box to indicate that he agrees before he may continue ("clickwrap") or (2) the website's terms and conditions are provided to users via a hyperlink at the bottom of a webpage and a user's assent to the terms is assumed by his continued use of the website ("browsewrap").[2]  In *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559 (9th Cir. 2014), the Ninth Circuit found lack of mutual assent

---

[2] The Court further notes that in *Lee v. Intelius*, the Ninth Circuit was applying Washington state law, and noted that "Washington courts have not decided whether or under what circumstances a 'click' constitutes a signature."  737 F.3d at 1260–61.

United States District Court
Northern District of California

where the plaintiff purchased a car from Toyota that came with a trial subscription to Sirius XM satellite radio, but did not receive any documents from Sirius XM to indicate that he was entering into a contractual relationship with that entity until a month later. *See id.* at 566. And similarly, in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), the Ninth Circuit found lack of mutual assent where the plaintiff purchased a Samsung Galaxy S4 phone that contained an arbitration provision embedded in a warranty brochure included in the phone box. *Id.* at 1281–90. In doing so, the Ninth Circuit noted that in general "silence or inaction does not constitute acceptance of an offer," and the Court further noted that the contractual nature of the document was not apparent. *See id.* at 1284–86.

Here, the contractual nature of the Business Account Application is obvious on its face and its language is clear. *See* Dkt. No. 24-1, Ex. 1. As already noted above, on page five of the agreement, it states in **bold** that Plaintiff "confirm[s] [his] receipt of, and agreement to be bound by, the Bank's applicable . . . account agreement that includes the Arbitration Agreement . . . ." *See* Dkt. No. 24-1, Ex. 1 at 5. Defendants have therefore established that the parties formed an agreement to arbitrate.

## B.    Delegation of Arbitrability

Next, Plaintiff raises several issues concerning the enforceability of the arbitration agreement, including whether it violates the California Supreme Court's opinion in *McGill v. Citibank N.A.*, 2 Cal. 5th 945 (Cal. 2017). *See* Dkt. No. 29 at 8–11. Defendants contend that the parties agreed to arbitrate such issues, and further disagrees that the arbitration agreement violates *McGill*. *See* Dkt. No. 30 at 7–9.

Parties to an arbitration agreement "can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). "[W]hether the court or the arbitrator decides arbitrability is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). Therefore, courts "apply a more rigorous standard" to gateway questions of

arbitrability. *See Momot v. Mastro*, 652 F.3d 982, 987–88 (9th Cir. 2011). "[C]lear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so." *Id.* at 988. The Supreme Court has clarified:

> When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

*Henry Schein*, 139 S. Ct. at 529.

The arbitration agreement in this case states that any dispute regarding "a disagreement about th[e] Arbitration Agreement's meaning, application, or enforcement" is subject to arbitration, and that the arbitration will be conducted in accordance with the American Arbitration Association ("AAA") "commercial dispute resolution procedures." *See* Dkt. No. 24-1, Ex. 8 at 6–7. The AAA Commercial Arbitration Rules, in turn, further provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* AAA Commercial Arbitration Rules and Mediation Procedures R-7(a).[3] In response, Plaintiff suggests in passing that the delegation language here is not as "clear" or "specific" as in other cases. *See* Dkt. No. 29 at 10–11. Yet Plaintiff fails to explain this conclusory assertion. *Id.* And even if the specific language in the arbitration agreement were somehow insufficient evidence on its own, the agreement also incorporates the AAA Commercial Rules. The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."[4] *See Brennan v.*

---

[3] *See* American Arbitration Association, http://www.adr.org/sites/default/files/CommercialRules_Web.pdf (last visited Jan. 8, 2021).

[4] Although the Ninth Circuit in *Brennan* left open the question of whether its holding only applies to sophisticated parties and commercial contracts, it noted that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to

United States District Court
Northern District of California

1    *Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  The Court therefore finds that the parties'

2    arbitration agreement expressly delegates questions of the arbitrability of any dispute and the

3    enforceability  of the arbitration agreement to the arbitrator.

4         Plaintiff also suggests that the arbitration agreement violates the California Supreme

5    Court's opinion in *McGill v. Citibank N.A.*, 2 Cal. 5th 945 (Cal. 2017), and the agreement is

6    therefore unenforceable.  *See id.*  In *McGill*, the California Supreme Court held that arbitration

7    provisions are invalid and unenforceable if they purport to waive a plaintiff's statutory right to

8    seek public injunctive relief in any forum.  *See* 2 Cal. 5th 945 (Cal. 2017).  In *McGill*, the plaintiff

9    brought claims under California's Consumer Legal Remedies Act, UCL, and false advertising

10   laws, and sought an injunction prohibiting the defendant from continuing to engage in its allegedly

11   illegal and deceptive practices.  *Id.* at 952.  The defendant sought to compel arbitration, and the

12   Court held that the arbitration provision was unenforceable because it waived the plaintiff's right

13   to seek public injunctive relief under these statutes in any forum.  *Id.* at 954.  The Ninth Circuit

14   has since held that the "*McGill* rule" is a contract defense that is not preempted by the FAA.  *See*

15   *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 830–31 (9th Cir. 2019).  Plaintiff in this case invokes

16   *McGill*, and argues that public injunctive relief is available to redress his UCL and false

17   advertising claims, but that such relief is otherwise precluded under the arbitration agreement.  *See*

18   Dkt. No. 29 at 10.

19        Plaintiff appears to suggest that the Court—and not the arbitrator—should decide whether

20   the arbitration agreement is invalid and unenforceable under *McGill*.  *See id.* at 10–11.  The

21   Supreme Court has held that "[a]n agreement to arbitrate a gateway issue is simply an additional,

22   antecedent agreement [that] the party seeking arbitration asks the federal court to enforce, and the

23   FAA operates on this additional arbitration agreement just as it does on any other."  *See Rent-A-*

24   *Center*, 561 U.S. at 69–70.  "Accordingly, unless [Plaintiff] challenge[s] the delegation provision

25   specifically, [the Court] must treat it as valid under § 2 [of the FAA], and must enforce it under

26   §§ 3 and 4, leaving any challenge to the validity of the [a]greement as a whole for the arbitrator."

27   _____

28   commercial contracts."  *Brennan*, 796 F.3d at 1130–31.  Regardless, Plaintiff entered into a
     business account agreement with Defendants, and does not argue that he was unsophisticated.

United States District Court
Northern District of California

*Id.* at 72.  In *Rent-a-Center*, for example, the Supreme Court noted that the plaintiff had "opposed the motion [to compel arbitration] on the ground that 'the arbitration agreement in question is clearly unenforceable in that it is unconscionable,'" *id.* at 66, and that "[n]owhere in his opposition to [the defendant's] motion to compel arbitration did he even mention the delegation provision," *id.* at 72.  The Court therefore upheld the delegation provision.  *See id.* at 72–76.  Here too, although Plaintiff's invocation of the *McGill* rule is directed to the arbitration agreement in general, he does not specifically challenge the delegation provision at all.

And the application of the "*McGill* rule" is a gateway issue that may be delegated to the arbitrator.  *Accord Dekker v. Vivint Solar, Inc.*, No. C 19-07918 WHA, 2020 WL 1429740, at *3–4 (N.D. Cal. Mar. 24, 2020), *vacated on other grounds*, No. C 19-07918 WHA, 2020 WL 4732194 (N.D. Cal. Aug. 14, 2020); *Cooper v. Adobe Sys. Inc.*, No. 18-CV-06742-BLF, 2019 WL 5102609, at *7 (N.D. Cal. Oct. 11, 2019); *Revitch v. Uber Techs., Inc.*, No. 18-CV-2974-PSG-GJS, 2018 WL 6340755, at *5 (C.D. Cal. Sept. 5, 2018); *DeVries v. Experian Info. Sols., Inc.*, No. 16-CV-02953-WHO, 2017 WL 733096, at *8–9 (N.D. Cal. Feb. 24, 2017).  In *McGill*, the parties agreed that the scope and effect of the provision at issue was to waive the right to relief in any forum, and the California Supreme Court considered only that waiver.  *See McGill*, 2 Cal 5th at 956.  Not so here.  The parties appear to dispute (1) whether Plaintiff's claims based on his PPP application fall within the scope of the arbitration agreement; (2) whether Plaintiff has sought—or even can seek—public injunctive relief for his claims; (3) whether the arbitration agreement in fact bars all claims for public injunctive relief in violation of *McGill*; and (4) assuming the arbitration agreement runs afoul of *McGill*, the impact on the enforceability of the arbitration agreement as to Plaintiff's claims.  *Compare* Dkt. No. 29 at 10–11 *with* Dkt. No. 30 at 8–9.  The arbitration agreement in this case delegates such questions about the "meaning, application, and enforcement" of the arbitration agreement to the arbitrator.  *See* Dkt. No. 24-1, Ex. 8 at 6–7.  The Court therefore "possesses no power to decide [such] arbitrability issue[s]."[5]  *See Henry Schein*, 139 S. Ct. at 529;

---

[5] Plaintiff relies heavily on *Lotsoff v. Wells Fargo Bank, N.A.*, No. 18-CV-02033-AJB-JLB, 2019 WL 4747667, at *4 (S.D. Cal. Sept. 30, 2019), to conclude that the arbitration agreement runs afoul of the *McGill* rule.  But critically, the court in *Lotsoff* did not address the question of whether a court or an arbitrator has authority to determine whether an agreement is invalid under *McGill*.

1    *see also Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) ("Although

2    challenges to the validity of a contract with an arbitration clause are to be decided by the

3    arbitrator, challenges to the very existence of the contract are, in general, properly directed to the

4    court.") (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006)).

5            Because the arbitrability of this dispute is itself a question for an arbitrator, it is neither

6    necessary nor appropriate for the Court to consider the parties' positions regarding the scope and

7    validity of the arbitration agreement.

8    **IV.    CONCLUSION**

9            Accordingly, the Court **GRANTS** the motion to compel arbitration and **STAYS** the case

10   pending completion of arbitration. The parties are directed to file a joint status report regarding the

11   status of the arbitration proceeding 120 days from the date of this order and every 120 days

12   thereafter unless otherwise ordered.  The clerk is directed to administratively close the case.

13           **IT IS SO ORDERED.**

14   Dated:  1/20/2021

15

16                                                    HAYWOOD S. GILLIAM, JR.
                                                      United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California